JOHN JOSEPH FRERICKS ET AL. *v.* GENERAL
MOTORS CORPORATION ET AL.

[No. 241, September Term, 1973.]

*Decided March 18, 1974.*

The cause was argued before GILBERT, MENCHINE and LOWE, JJ.

*Leon J. Rudd*, with whom were *Wartzman, Rombro, Rudd & Omansky* on the brief, for appellants.

*George D. Solter*, with whom was *Leonard E. Wilson* on the brief, for appellee Anchor Pontiac Buick, Inc. *Joseph G. Finnerty, Jr.*, with whom were *Edward S. Digges, Jr.*, and *Ross L. Malone* on the brief, for appellee General Motors Corporation.

MENCHINE, J., delivered the opinion of the Court. LOWE, J., dissents and filed a dissenting opinion at page 540 *infra.*

*Evans* [1] and *Larsen*,[2] continuing their national battle for supremacy, meet for the first time on Maryland soil.[3] Each a

---

1. *Evans v. General Motors Corp.*, 359 F. 2d 822 (7th Cir.) *cert. den.* 87 S. Ct. 83 (1966).
2. *Larsen v. General Motors Corp.*, 391 F. 2d 495 (8th Cir. 1968).
3. In *Mondshour v. General Motors Corp.*, 298 F. Supp. 111 (D.C. Md. 1969) Judge [now Chief Judge] Northrop pointed to the conflict between *Larsen* and *Campo v. Scofield, infra*, (principal reliance of *Evans*) but found it unnecessary to make a determination of the Maryland law. In *Bremier v. Volkswagen of America, Inc.*, 340 F. Supp. 949 (D.C. District of Columbia 1972) Judge Green concluded that Maryland would follow *Larsen.* For reasons to be stated *infra* we reject the conclusion therein reached.

direct descendant of *MacPherson v. Buick*, 111 N. E. 1050 (N.Y. 1916), they have enunciated "second collision" principles precisely poles apart. Their clashing concept as to the appropriate legal principle controlling manufacturers' liability for design defects producing enhanced injuries in motor vehicle accidents but not causing or contributing to the initial collision, has led to a new "War between the States" unsurpassed since 1865.

In *Evans*, liability asserted alternatively under: (a) negligence, (b) breach of implied warranty, and (c) strict tort liability,[4] was rejected under all theories. Liability under general negligence standards and under strict tort liability was rejected on the basis of the absence of a duty owed; liability was denied under implied warranty upon the ground there was no showing of unfitness for intended use.

Although *Larsen* clearly had sustained liability under general negligence standards, its progeny, though parading under its banner, sometimes imposed liability by way of warranty[5] or strict tort liability.[6]

Lines of demarcation in legal theory hardly can be more starkly drawn or more vigorously debated than the disparate views expressed in *Evans v. General Motors Corp.*,

---

4. *Restatement (Second) of Torts*, § 402A (1965) thus declares the doctrine:
> "Special Liability of Seller of Product for Physical Harm to User or Consumer
>> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>>> (a) the seller is engaged in the business of selling such a product, and
>>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>> (2) The rule stated in Subsection (1) applies although
>>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

5. *Friend v. General Motors Corp.*, 165 S.E.2d 734 (1968) *Cert. dismissed as improvidently granted* 167 S.E.2d 926.

6. *Dyson v. General Motors Corp.*, 298 F. Supp. 1064 (U.S.D.C. E.D. Pa. 1969).

*supra,* (CCA 7 declaring Indiana law), and *Larsen v. General Motors Corp., supra,* (CCA 8 declaring Michigan law).

*Evans* thus stated the issue and answer:

P. 824

"Plaintiff's theory is that the collision which occurred was a foreseeable emergency and that by omitting side frame rails, defendant created an unreasonable risk of harm to occupants of the automobile it manufactured.

Plaintiff asserts that defendant was negligent in designing and in failing to test the design of the automobile; that defendant breached implied warranties that the automobile was of merchantable quality and reasonably fit for use as an automobile; that defendant placed in the stream of commerce an automobile in a dangerous and defective condition in that it was equipped with an "X" frame lacking side frame protection, thus proximately causing the fatal injuries to the decedent when the automobile was involved in a broadside collision, for which the defendant is strictly liable to plaintiff.

The major question before us is the nature of the duty which an automobile manufacturer owes to users of its product. This presents an issue of law for the Court.

\* \* \*

A manufacturer is not under a duty to make his automobile accident-proof or fool-proof; nor must he render the vehicle 'more' safe where the danger to be avoided is obvious to all. Campo v. Scofield, 1950, 301 N.Y. 468, 95 N.E. 2d 802, 804. Perhaps it would be desirable to require manufacturers to construct automobiles in which it would be safe to collide, but that would be a legislative function, not an aspect of judicial interpretation of existing law."

P. 825

"The intended purpose of an automobile does not include its participation in collisions with other objects, despite the manufacturer's ability to foresee the possibility that such collisions may occur. As defendant argues, the defendant also knows that its automobiles may be driven into bodies of water, but it is not suggested that defendant has a duty to equip them with pontoons.

We cannot agree with the plaintiff that the defendant had a duty to equip all its automobiles with side rail perimeter frames, or that such a duty can be inferred from the mere fact that some of the defendant's, or some of its competitors', automobiles are now made with side rails, or from the opinions of certain experts that perimeter frames are 'safer' in a collision. Defendant had a duty to test its frame only to ensure that it was reasonably fit for its intended purpose."

*Larsen* thus stated the issue and answer:

P. 496

"The plaintiff * * * received severe bodily injuries while driving * * *. A head-on collision, with the impact occurring on the left front * * * caused a severe rearward thrust of the steering mechanism into the plaintiff's head."

P. 497

"The plaintiff does not contend that the design caused the accident but that because of the design he received injuries he would not have otherwise received or, in the alternative, his injuries would not have been as severe. The rearward displacement of the steering shaft on the left frontal impact was much greater on the Corvair than it would be in other cars that were designed to protect against such a rearward displacement."

P. 498

"Both parties agree that the question of a manufacturer's duty in the design of an automobile or of any chattel is a question of law for the court.

\* \* \*

There is a line of cases directly supporting General Motors' contention that negligent design of an automobile is not actionable, where the alleged defective design is not a causative factor in the accident. The latest leading case on this point is Evans v. General Motors Corporation, 359 F.2d 822 (7 Cir. 1966), cert. denied, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966)."

P. 501

"Accepting, therefore, the principle that a manufacturer's duty of design and construction extends to producing a product that is reasonably fit for its intended use and free of hidden defects that could render it unsafe for such use, the issue narrows on the proper interpretation of 'intended use'. Automobiles are made for use on the roads and highways in transporting persons and cargo to and from various points. This intended use cannot be carried out without encountering in varying degrees the statistically proved hazard of injury-producing impacts of various types. The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident."

P. 502

"We think the 'intended use' construction urged by General Motors is much too narrow and unrealistic. Where the manufacturer's negligence in

design causes an unreasonable risk to be imposed upon the user of its products, the manufacturer should be liable for the injury caused by its failure to exercise reasonable care in the design. These injuries are readily foreseeable as an incident to the normal and expected use of an automobile. While automobiles are not made for the purpose of colliding with each other, a frequent and inevitable contingency of normal automobile use will result in collisions and injury-producing impacts. No rational basis exists for limiting recovery to situations where the defect in design or manufacture was the causative factor of the accident, as the accident and the resulting injury, usually caused by the so-called 'second collision' of the passenger with the interior part of the automobile, all are foreseeable. Where the injuries or enhanced injuries are due to the manufacturer's failure to use reasonable care to avoid subjecting the user of its products to an unreasonable risk of injury, general negligence principles should be applicable. The sole function of an automobile is not just to provide a means of transportation, it is to provide a means of safe transportation or as safe as is reasonably possible under the present state of the art."

P. 503

"We perceive of no sound reason, either in logic or experience, nor any command in precedent, why the manufacturer should not be held to a reasonable duty of care in the design of its vehicle consonant with the state of the art to minimize the effect of accidents. The manufacturers are not insurers but should be held to a standard of reasonable care in design to provide a reasonably safe vehicle in which to travel.

\* \* \*

This duty of reasonable care in design rests on

common law negligence that a manufacturer of an article should use reasonable care in the design and manufacture of his product to eliminate any unreasonable risk of foreseeable injury.

\* \* \*

Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design."

P. 504

"We think the duty of the use of reasonable care in design to protect against foreseeable injury to the user of a product and perhaps others injured as an incident of that use should be and is equally applicable to all manufacturers with the customary limitations now applied to protect the manufacturer in case of an unintended and unforeseeable use.

\* \* \*

We, therefore, do not think the automotive industry is being singled out for any special adverse treatment by applying to it general negligence principles in (1) imposing a duty on the manufacturer to use reasonable care in the design of its products to protect against an unreasonable risk of injury or enhancement of injury to a user of the product, and (2) holding that the intended use of an automotive product contemplates its travel on crowded and high speed roads and highways that inevitably subject it to the foreseeable hazards of collisions and impacts. Neither reason, logic, nor controlling precedents compel the courts to make a

distinction between negligent design and negligent construction.

The manufacturer's duty to use reasonable care in the design and manufacture of a product to minimize injuries to its users and not to subject its users to an unreasonable risk of injury in the event of a collision or impact should be recognized by the courts. The manufacturers themselves have, in various public utterances in discussing automotive safety, expressed their concern for making safer vehicles. And General Motors admits the foreseeability of accidents which are matters of public and common knowledge over a long period of time. Legal acceptance or imposition of this duty would go far in protecting the user from unreasonable risks. The normal risk of driving must be accepted by the user but there is no need to further penalize the user by subjecting him to an unreasonable risk of injury due to negligence in design."

## The Subject Litigation

John Joseph Frericks (Passenger) filed a multiple count declaration alleging: that he was a passenger in; that Ronald D. Baines (Driver) was the driver of; that Walter Baines and Agnes Baines (Owners) were the owners of; that General Motors Corporation (Manufacturer) was the manufacturer of; and that Anchor Pontiac Buick, Inc. (Seller) was the seller of; a 1969 Opel Cadet Two Door Sedan.

In Case No. I it was alleged that on September 2, 1970, Driver operated the automobile at an excessive and unlawful speed, causing it to run off the road and overturn. Damages for personal injuries and other losses were claimed from the Driver and Owners.

Case II, Count I repeated by reference all allegations of Case No. I and further alleged that after leaving the highway the vehicle rolled over on its roof "causing the roof supports to collapse, bend, crumble and give way, unable to support the weight of the automobile"; that "at the same

time the seat mechanism in which passenger was reclining at a 5° angle failed and dropped rearward to an 80° angle," the two conditions then combining to cause a second impact to occur between passenger's head and the collapsing roof, crushing his skull and causing greatly enhanced injury and damage. The count further alleged that collisions and overturning accidents of vehicles on the highway were foreseeable by the manufacturer and seller and should have been taken into account by them in the design, construction, manufacture and distribution of the involved motor vehicle; but that they negligently failed to use appropriate design and to provide safe engineering qualities with respect to the vehicle roof and the seat mechanism. Damages were claimed from Manufacturer and Seller grounded in negligence.

Case II, Count II repeated prior allegations and further alleged that Manufacturer introduced the automobile into the stream of commerce and that Seller sold the same to Owners, thereby giving rise to an implied warranty, running to Passenger's benefit that was breached by Manufacturer and Seller with resultant damages.

Case II, Count III repeated allegations heretofore stated and further alleged an express warranty, running to Passenger's benefit, that was breached by Manufacturer and Seller with resultant damages.

Case II, Count IV repeated allegations heretofore stated in Case II, Count I and claimed damages for personal injuries and other losses on the theory of strict liability in tort.

There was no allegation in any count that the alleged defect in design caused or contributed in any way to the initial upset of the vehicle.

Driver and Owners filed pleas. Manufacturer and Seller demurred to Case I and to all counts of Case II. The trial judge sustained the demurrers without leave to amend. An appeal from the judgments thereafter entered in favor of Manufacturer and Seller was dismissed as prematurely taken because of the continuing pendency of claims against Driver and Owners. *Frericks v. Baines*, 16 Md. App. 343, 296 A. 2d 706.

Upon remand after dismissal of the earlier appeal, settlement by Passenger with Driver and Owners was made and an Order of Satisfaction filed as to Driver and Owners. This appeal followed from the then final judgments in favor of Manufacturer and Seller.

### General Negligence Standards

We are required to choose between *Evans* and *Larsen*. We have chosen *Evans*. We now give the reasons for our choice.

*Evans, supra,* grounded decision essentially upon the precepts of *Campo v. Scofield,* 95 N.E.2d 802 [N.Y. 1950], wherein it was said:

P. 803

> "The cases establish that the manufacturer of a machine or any other article, dangerous because of the way in which it functions, and patently so, owes to those who use it a duty merely to make it free from latent defects and concealed dangers. Accordingly, if a remote user sues a manufacturer of an article for injuries suffered, he must allege and prove the existence of a latent defect or a danger not known to plaintiff or other users."

> * * *

P. 804

> "If a manufacturer does everything necessary to make the machine function properly for the purpose for which it is designed, if the machine is without any latent defect, and if its functioning creates no danger or peril that is not known to the user, then the manufacturer has satisfied the law's demands. * * * In other words, the manufacturer is under no duty to render a machine or other article 'more' safe — as long as the danger to be avoided is obvious and patent to all.

> To impose upon a manufacturer the duty of producing an accident-proof product may be a desirable aim, but no such obligation has been —

or, in our view, may be — imposed by judicial decision."

* * *

P. 805

"It may well be argued that, since the development of mechanical contrivances has created so many new dangers, manufacturers should be compelled to equip complicated modern machinery with all possible protective guards or other safety devices. If, however, the manufacturer's liability is to be so extended, if so fundamental a change is to be effected, we deem it the function of the legislature rather than of the courts to achieve that change."

Thus it is that the *Evans'* Court concluded, properly we think, that so complex and universal a problem should be left to legislative decision. Perhaps that Court was conscious of impending congressional action.

*Larsen, supra,* on the other hand, relied essentially upon four cases, namely: *Ford v. Zahn,* 265 F. 2d 729 [CCA 8 1959]; *Blitzstein v. Ford,* 288 F. 2d 738 [CCA 5 1961]; *Comstock v. General Motors Corp.,* 99 N.W.2d 627 [Mich. 1959], and *Spruill v. Boyle-Midway,* 308 F. 2d 79, [CCA 4 1962]. We do not find them persuasive.

*Evans* had discussed *Ford v. Zahn, supra,* and had made crystal clear that it was without weight in non-causative design situations, in that it was precisely because the vehicle in that case was "unfit for [its] intended use and in precisely that respect [was] the cause of accidental [injury]." *Blitzstein v. Ford* and *Comstock v. General Motors Corp.,* both involving defects causally related to the initial event, are equally distinguishable for precisely the same reason.

*Spruill v. Boyle-Midway, supra,* dealt with a claim for the wrongful death of a child caused by ingestion of a substance toxic to humans, the container of which bore an inadequate warning of the dangerous nature of the product. Applicability of *Spruill* to cases involving the manufacture

of motor vehicles is foreclosed totally by decisions of the Court of Appeals of Maryland in *Myers v. Montgomery Ward & Co.*, 253 Md. 282, 252 A. 2d 855, and *Blankenship v. Morrison Machine Co.*, 255 Md. 241, 257 A. 2d 430, in both of which *Campo v. Scofield* was cited with approval. See also *Patten v. Logemann Brothers Co.*, 263 Md. 364, 283 A. 2d 567.

In *Blankenship, supra,* the Court of Appeals said at page 246 [432]:

> "In *Myers*, then, we adhered firmly to the latent-patent test (which, according to 2 Harper and James, The Law of Torts, § 28.5, p. 1544, is a vestigial carryover from pre-*MacPherson* days [*MacPherson v. Buick Motor Co.* (N.Y.), 111 N. E. 1050], when deceit was needed for recovery). As the quotation from *Campo v. Scofield* shows, Maryland has followed New York, which still remains loyal to the vestigial carryover of the latent-patent rule."

Significantly, *Evans, supra,* was cited in *Blankenship* as supporting the quoted language.

We had previously noted [Footnote 3] that Judge Green in the case of *Bremier v. Volkswagen of America, Inc., supra* had concluded that Maryland would follow *Larsen*. That conclusion was based upon the belief that Maryland would follow *Spruill* as an authority in a noncausative "second collision" claim. For the reasons previously given we do not do so. *Spruill, supra,* there applying Virginia law, has not been cited in any Maryland Appellate decision.

We find that the basic assumption of *Larsen* was that liability should be co-extensive with foreseeability and regard that assumption as totally fallacious. Before and after *Larsen*, legal scholars had criticized use of foreseeability as the sole test in the determination of a duty owed. Professor Leon Green, (University of Texas) in an article titled: *"Foreseeability in Negligence Law,"* published in 61 Columbia Law Review 1401, *et seq.* (1961), said at page 1412:

> "An attempt to rest liability in negligence cases

wholly on the gossamer of foreseeability seems so far removed from the practical world of affairs as to suggest the Wizard of Oz or the creations of Disneyland."

In the latest (1971) edition, Prosser, expressing a kindred view said:

"As a formula this is so vague as to have little meaning, and as a guide to decision it had no value at all." *Law of Torts 4th Ed.*, p. 326.

*Tobin v. Grossman*, 249 N.E.2d 419 [New York 1969] very cogently stated the dangers inherent in the formula: [P. 423] "If foreseeability be the sole test, then once liability is extended the logic of the principle would not and could not remain confined."

Some cases, following Larsen's careening "foreseeability" down the road to the manufacturer's door, ignore totally the braking effect inherent in the allied requirement that the product must be *unreasonably dangerous*, whether liability is suggested under § 402A or under general negligence standards.[7] Others, giving lip-service to the "latent-patent" test of a manufacturer's duty, have strained it almost to the breaking point.[8]

On September 9, 1966, eighteen months prior to decision in *Larsen*, the Congress passed Public Law 89-563 (15 U.S.C.A. 1381-1431, inclusive), known as the National Traffic and Motor Vehicle Safety Act of 1966 (The Act). It seems to us that this should have alerted the courts to an awareness that orderly, progressive and uniform standards

---

7. In *Mickle v. Blackmon*, 166 S.E.2d 173 [S. Car. 1969] the plaintiff was injured in 1962 when her 1949 Ford collided with another vehicle at an intersection. She was impaled by the gear shift lever that had been topped by a knob of white plastic. Exposure to the ultra-violet rays of sunlight over the years had caused the knob to deteriorate so that it shattered upon impact. Foreseeability was found and liability was sustained. A gossamer thread indeed!

8. *Bolm v. Triumph Motor Co.*, 341 N.Y.S.2d 846, where a manufacturer was held under foreseeability for the castration of a motorcyclist who had been thrown forward into the luggage carrier of his cycle after collision with an automobile. The defect was held to be latent as to the cyclist!

*Cf. Blankenship v. Morrison Machine Co., supra.*

of design for motor vehicles and their equipment would be established to provide reasonable and objective bases for the determination of manufacturers' liability for design defects.

*Larsen*, however, dealt very cavalierly with The Act, saying at page 506:

> "It is apparent that the National Traffic Safety Act is intended to be supplementary of and in addition to the common law of negligence and product liability. The common law is not sterile or rigid and serves the best interests of society by adapting standards of conduct and responsibility that fairly meet the emerging and developing needs of our time. The common law standard of a duty to use reasonable care in light of all the circumstances can at least serve the needs of our society until the legislature imposes higher standards or the courts expand the doctrine of strict liability for tort."

*Larsen* then rejected *Evans*, and promulgated its own nebulous and subjective test of "foreseeability" for the determination of a manufacturer's liability for design defects.

We do not read The Act in so limited a style and consider it desirable to recite herein some of its imperative commands and limitations.

§ 1381

> "Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress *determines that it is necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce, to undertake and support necessary safety research and development*; and to expand the national driver register." [Italics supplied]

§ 1392

> "(a) The Secretary [of Transportation] *shall*

*establish* by order appropriate Federal *motor vehicle safety standards.* Each *such Federal motor vehicle safety standard shall be practicable, shall meet the need for motor vehicle safety, and shall be* stated in objective terms.* * * [9]

(d) *Whenever a Federal motor vehicle safety standard established under this subchapter is in effect, no State or political subdivision of a State shall have any authority to establish, or to continue in effect* * * * *any standard* * * * *which is not identical to the Federal standard.* * * *

(f) In prescribing standards * * * the Secretary shall —

(1) *consider* * * * motor vehicle safety data, including *the results of research, development, testing and evaluation activities conducted pursuant to this chapter."* [Italics supplied]

§ 1397

"(a) No person shall —

(1) *manufacture* for sale, sell, offer for sale, or introduce * * * in interstate commerce * * * *any motor vehicle or item of motor vehicle* * * * manufactured on or *after the date any applicable Federal motor vehicle safety standard takes effect* * * * *unless* * * * *in conformity with such standard* * * *.

(c) Compliance with any Federal motor vehicle safety standard issued under this subchapter *does not exempt any person from any liability under common law.* * * *" [Italics supplied]

The decision of the *Larsen* Court to reject *Evans* and substantially to ignore The Act has led to widespread appellate decisional differences.

---

**9.** At the time of the writing of this opinion 48 motor vehicle safety standards had been established under this section. See: *Code of Federal Regulations,* Title 49, Ch. 5, Part 571. Standard 571.208 relates to occupant crash protection.

State Appellate Courts, or Federal District and Circuit Courts of Appeal declaring State law in nine States and the District of Columbia have followed *Larsen*. Those States are:

## *California*

*Badorek v. General Motors Corp.*, 90 Cal. Rpt. 305 [Court of Appeal, 3rd Dist. 1970]

*Cronin v. Olson Corp.*, 501 P. 2d 1153 [Sup. Ct. Cal. 1972]

## *District of Columbia*

*Bremier v. Volkswagen of America, Inc.*, 340 F. Supp. 949 [D.C. District of Columbia 1972]

## *Georgia*

*Friend v. General Motors Corp.*, 165 S.E.2d 734. *Cert. dismissed* 167 S.E.2d 926 [1969]

## *Iowa*

*Passwaters v. General Motors Corp.*, 454 F. 2d 1270 [CCA 8 1972]

## *New York* [10]

*Bolm v. Triumph Corp.*, 341 N.Y.S.2d 846 [S. Ct. App. Div. 4th Dept. 1973]

## *Oregon*

*May v. Portland Jeep, Inc.*, 509 P. 2d 24 [Oregon 1973]

## *Pennsylvania*

*Dyson v. General Motors Corp.*, 298 F. Supp. 1064 [U.S.D.C. E.D. Pa. 1969]

## *South Carolina*

*Mickle v. Blackmon*, 166 S.E.2d 173 [South Carolina 1969]

---

**10.** Rule disputed at co-equal intermediate court level. *Edgar v. Nachman, infra.*

### South Dakota

*Engberg v. Ford Motor Co.,* 205 N.W.2d 104 [South Dakota 1973]

### Wisconsin

*Grundmanis v. British Motors Corp.,* 308 F. Supp. 303 [D.C. E.D. Wis. 1970]

State Appellate Courts, or Federal District and Circuit Courts of Appeal declaring State law in ten States have followed *Evans.* Those States are:

### Illinois

*Mieher v. Brown,* 301 N.E.2d 307 [Illinois, 1973]

### Indiana

*Schemel v. General Motors Corp.,* 384 F. 2d 802 [CCA 7 1967]

### Mississippi

*Walton v. Chrysler Corp.,* 229 So. 2d 568 [Miss. 1969]

*Ford Motor Co. v. Simpson,* 233 So. 2d 797 [Miss. 1970]

*General Motors Corp. v. Howard,* 244 So. 2d 726 [Miss. 1971]

### Montana

*Ford v. Rupple,* 504 P. 2d 686 [S. Ct. Mont. 1972]

### New Jersey

*Devaney v. Sarno,* 299 A. 2d 95 [Superior Ct. of N.J., Law Div. 1973]

### New York [11]

*Edgar v. Nachman,* 323 N.Y.S.2d 53 [S. Ct. App. Div., 3rd Dept. 1971]

---

**11.** Rule disputed at co-equal intermediate court level. *Bolm v. Triumph Corp., supra.*

*North Carolina*

*Bulliner v. General Motors Corp.,* 54 FRD 479 [D.C. E.D. N.C. 1971]

*Alexander v. Seaboard Airline,* 346 F. Supp. 320 [D.C. W.D. N.C. 1971].

*Ohio*

*Burkhard v. Short,* 275 N.E.2d 632 [CA Ohio 1971]

*Shumard v. General Motors Corp.,* 270 F. Supp. 311 [D.C. S.D. Ohio E.D. 1967]

*Texas*

*Willis v. Chrysler Corp.,* 264 F. Supp. 1010 [D.C. S.D. Tex. 1967]

*General Motors Corp. v. Muncy,* 367 F. 2d 493 [CCA 5 1966]

*West Virginia*

*McClung v. Ford Motor Co.,* 333 F. Supp. 17 [D.C. S.D. W. Va., Beckley Div.] [Affirmed 472 F. 2d 240, CCA 4 1973]

We do not deem it of value to delineate the facts or the reasons given for decision in the cases above recited. We shall quote from only that case that seems to us most clearly to demonstrate the wisdom of *Evans* and the fallacy of *Larsen.* We adopt fully the language used by District Judge Knapp in *McClung v. Ford Motor Co.,* 333 F. Supp. 17, 20 [D.C. S.D. W.Va.], affirmed per curiam 472 F. 2d 240 [1973], when he said:

> "The adoption of the legal theory propounded by the plaintiff would impose on the manufacturer of service products a duty not contemplated by the common law, and not founded in reason in view of the impact such a rule would impose on the basic industry in our economic complex. What standards of duty or reasonableness of design could the courts, in their wisdom require? Who is to

determine the design standards to be imposed? The problems presented by such a proposal certainly would require consideration and evaluation of a number of factors, technical and economic, and is a matter that properly should be resolved by the law making bodies who are directly responsible to the people who make up this Republic. If certain requirements for uniform automobile design are to be imposed upon the manufacturers thereof, then it is for the legislative bodies to make such a determination after full consideration of its political and economic implications. To impose liability on the manufacturer of commonly used products on the theory herein advanced would require a radical departure from generally accepted standards in technology, and would encroach, in my humble opinion, on the functions of the legislative branch of the government.

\* \* \*

I do not believe that the theory of liability so advanced is founded in reason or dictated by compelling social or political considerations. Irrespective of the equities of a particular case, or a particular concept, the law must retain a quality of uniformity, practicability and concerned reasonableness if stability in our institutions is to survive."

A mere glance at the list of States espousing the *Evans* or the *Larsen* dogma makes plain that geography played no part in the determination of their espousal. Examination of cases in the states following *Larsen* shows decisional results grounded upon varying reasons, sometimes on negligence standards, sometimes under strict liability in tort, and sometimes under a theory of breach of implied warranty. Thus the difference in legal philosophy evidenced in the *Evans* and *Larsen* decisions has been both widened and splintered in some States reaching *Larsen's* conclusion.

Diversity of opinion among the courts of the several

States, with concomitant opposite results to litigants in those courts, certainly is not unknown to the judicial system of the United States. However, to have such a condition extant in a rule of law applicable to litigation of the magnitude and universality of motor vehicle tort claims, is particularly undesirable and unfortunate. We are persuaded that desirable uniformity of decision more likely will be achieved under the *Evans'* thesis. We shall not proliferate the legal chaos inherent in the acceptance of the *Larsen* theory.

The brief of Manufacturer contends that we should determine liability on the basis of North Carolina law, citing *Dersookian v. Helmick*, 256 Md. 627, 261 A. 2d 472 [1970] as requiring this State to apply the *lex loci delicti* [North Carolina]. The point was not raised below and is not before us.[12] Rule 1085.

Because we find no liability as to Manufacturer, we do not reach any issue as to whether the Seller is bound to a lesser liability.

## Implied Warranty

There is no implied warranty that a motor vehicle will be crashworthy. The intended use of a motor vehicle does not include its participation in collisions with other objects. *Evans v. General Motors Corp., supra;* Article 95B, § 2-315.

## Strict Liability in Tort

So great a scholar as Dean Prosser once stated that the difference between liability grounded on negligence and

---

**12.** The contention is without import because it is plain that the law herein declared is also the law of North Carolina. Thus, in *Alexander v. Seaboard Airline Railroad Co., supra,* (announcing North Carolina law) it was said at page 327:

> "This court rejects the *Larsen* rule, and declares that while a manufacturer is liable for defects in its products which cause injuries arising out of the 'intended use' for which the product is manufactured, it is not liable for injuries arising from defects of the automobile which did not cause or contribute to the cause of the accident."

See also: *Bulliner v. General Motors Corp., supra; Coakley v. Ford Motor Co.,* 182 S.E.2d 260, *cert. den.* 182 S.E.2d 244 [N.C. 1971].

grounded upon strict tort liability under § 402A of the Restatement is so slight that "Where the action is against the manufacturer of the product, an honest estimate might very well be that there is not one case in a hundred in which strict liability would result in recovery where negligence does not." *The Assault Upon The Citadel,* 69 Yale L.J. 1099, 1114 (1960).

Whether *Larsen* and its progeny have altered that opinion we do not know. *Larsen's* comment at page 506 that its "* * * common law standard * * * can at least serve the needs of our society until * * * the courts expand the doctrine of strict liability for tort" implies a contrary view of the effect of § 402A.

In any event, the Court of Appeals has declined to espouse the doctrine. *Telak v. Maszczenski,* 248 Md. 476, 237 A. 2d 434, and *Myers v. Montgomery Ward & Co.,* 253 Md. 282, 252 A. 2d 855. See also *Bona v. Graefe,* 264 Md. 69, 285 A. 2d 607.

In *Myers v. Montgomery Ward, supra,* it was said at page 297 [864]:

> "§ 402 A was the basis of the decision in *Ilnicki v. Montgomery Ward & Co., supra,* 371 F. 2d 195. The same contention was urged on us in *Telak v. Maszczenski,* 248 Md. 476, 237 A. 2d 434 (1968), where we commented on the debate which § 402 A had invoked, and declined to espouse the cause of strict liability at that time. Nor are we prepared to do so in this case. Comment g to 402 A says that the section 'applied *only* where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' "

We decline to espouse its cause here.

### Express Warranty

Case II Count III used conclusory general language in its allegations that Seller and Manufacturer expressly warranted the crashworthiness of the vehicle's roof and seat. We agree with the trial judge that the declaration as drafted

does not allege such facts as are legally sufficient to state a cause of action for breach of express warranty. The record does not affirmatively show that appellant would be unable to state facts — rather than conclusions — such as would authorize recovery under that theory. Privity of contract no longer is a requisite to recovery for breach of an express warranty if it is reasonable to expect that a person will use or be affected by the article sold. Article 95B, § 2-318; *Uppgren v. Executive Aviation Services, Inc.*, 326 F. Supp. 709 [D.C. Md. 1971].

As to Case II Count III we will permit the appellant, if he deems it desirable, to attempt to make a factual showing by amended declaration of a right to recover under the theory of an express warranty, provided he does so within sixty (60) days after remand.

> *Judgments in Case I, and in Counts I, II and IV of Case II affirmed. Appellant to pay the costs.*
> *Judgment in Count III of Case II reversed solely for the purpose of permitting plaintiff to file an amended declaration within 60 days after remand.*
> *Costs to abide the ultimate result.*

*Lowe, J., dissenting:*

At the risk of projecting the image of a recusant while still in my judicial novitiate, I am compelled to express my disaffection with my brothers' aversion to placing the responsibility for the proper design and construction of automobiles upon their manufacturers. In doing so I thank my brother Menchine for so adequately setting forth the language of *Larsen v. General Motors Corp.*, 391 F. 2d 495. To avoid repetition, suffice to say I adopt the rationale of that case and commend it for rereading.

One finds it difficult, however, to dispute the platitude with which *Larsen's* antipode, *Evans v. General Motors*

*Corp.*, 359 F. 2d 822, commences in an effort to lay its foundation:

> "the intended purpose of an automobile does not include its participation in collisions with other objects." [1]

*Evans* then summarily releases the manufacturer from responsibility for a design defect intensifying (if not causing) the injury, though not the original collision. The manufacturer is absolved of any responsibility even though the danger of the injury was "clearly a foreseeable danger arising out of the intended use." Prosser, *Law of Torts* (1971 Ed.), p. 646. Small wonder Professor Prosser refers to this limitation of liability as "rather specious" in its rationale. More to the point, we think it is the vestige of an "anachronism" based upon an era when motor cars were luxuries.[2]

Recognizing contemporary society's total reliance upon motor vehicles, we cannot in these times turn our backs upon the dangers incident to their use to which we have become subjugated.

> "Between one-fourth and two thirds of all vehicles manufactured are at some time during their subsequent use involved in the tragedy of human injury and death. Consequently the anticipation of this result by both designer and manufacturer is mandatory." [3]

---

1. The artificiality of the gloss placed upon the concept of intended use by Evans was pointed out in Dyson v. General Motors Corp., 298 F. Supp. 1064 (1969)

> " . . . it is the obligation of an automobile manufacturer to provide more than merely a movable platform capable of transporting passengers from one point to another. The passengers must be provided a reasonably safe container within which to make the journey. The roof is a part of such container, and, except in the case of vehicles like convertibles, which essentially have no roof in the normal sense of the term, the roof should provide more than merely protection against rain."

2. *See*, Note, 80 Harv. L. Rev. 688-694 (1966).

3. Grundmanis v. British Motor Corp., 308 F. Supp. 303 (1970), quoting Goddard and Haddon, "Passenger Car Design in Highway Safety."

The majority fears that to eschew the second-collision doctrine would be to equate the manufacturer's liability with boundless forseeability. My brothers could exorcise that fear by considering that the victims of such injury must still persuade the fact-finder that the design was defective; that it was unreasonably so and the defect was the proximate cause of the injury. The plaintiff here does not — nor could one in the future — proceed on the expectation of an "accident proof" car, but must point to the specific foreseeable faults.

The majority opinion points out that *Evans* "grounded (its) decision essentially upon the precepts of *Campo v. Scofield,* 95 N.E.2d 802 [N.Y. 1950] . . . ." This hardy foundation involved the duty of a manufacturer to equip an "onion topping machine" with a safety guard. Even assuming, though not conceding, *Campo* to be good law, the analogy to the standard of care owed in the manufacture of an *automobile* leaves something to be desired. The devastation caused by a defectively designed automobile, unleashed upon a society so totally dependent upon that vehicle, leads one to conjure catastrophies of gigantic proportions, hardly commensurate with those we foresee being caused by a defective "onion topper." The limited number of persons who have so much as seen an onion topping machine is paralleled only by the number of those who read dissenting opinions written for schismatic minorities.

My brother Menchine struck a sensitive chord by recommending a legislative solution to the problem. I accept that recommendation with alacrity, yet while awaiting those solutions I am reminded by Judge Kiley in his forceful *Evans* dissent that:

> " . . . the possibility of future adequate legislative standards does not remove the necessity of presently deciding whether plaintiff should or should not have an opportunity to prove the allegations made in the complaint."

Juror's judgments would, at best, provide invaluable indicia

of consumer expectations to those legislators formulating standards, and, at worst, would provide a spur to the representatives of the people to get on with their task.

Finally, were I as convinced as my brethren that the Court of Appeals "foreclosed totally" the question before us in *Myers* and *Blankenship*, I would assume the role more becoming me — a role of silence.[4] Those decisions, turning on the distinction between latent and patent defects, do not convince me that they are authority for the principle that the "proper use" of an automobile may not take into account collisions and injuries clearly foreseeable as an incident to its normal use. Nor does *Blankenship's* allegedly dangerous "sanforizing machine" do much to persuade me by analogy.

The second count in *Blankenship* charging breach of warranty as the proximate cause of the injury was dismissed as not persuasive because of lack of privity between the parties. In considering that peremptory dismissal we might now assess the policy direction taken by the Maryland Legislature since *Blankenship*. In 1969 the Legislature eliminated the privity prerequisite between manufacturers and buyers in warranty cases. Md. Code, Art. 95B § 2-314, (Laws of Md. 1969, Ch. 249). The *ratio legis* underlying that enactment recognizes for the first time a manufacturer's direct responsibility to the consumer. We would do well to apply that twentieth century concept to automobile architects who design vehicles with defects causing injuries which were reasonably foreseeable.

The Court of Appeals is seldom equivocal. When they speak on this question, have no fear that we need strain to interpret their position; a position which may well cause me to regret having held out the added inducement of my future silence.

---

4. "Silence is not always tact and it is tact that is golden, not silence." Samuel Butler