**TROY FIAUI, Plaintiff**

**v.**

**SANELE FAUMUINA, PITA TALIVA`A, and DOES I-X,
Defendants**

High Court of American Samoa
Trial Division

CA No. 47-92

November 30, 1994

Before RICHMOND, Associate Justice, TAUANU`U, Chief Associate Judge, and AFUOLA, Associate Judge.

Counsel: For Plaintiff, Charles V. Ala`ilima
 For Defendants, Afoa L. Su`esu`e Lutu

Opinion and Order:

Plaintiff Troy Fiaui ("Troy") brings this action to recover the cost of repairs to his 1989 Isuzu pickup, loss of its use, damages for intentional infliction of emotional distress, punitive damages, and attorney's fees and costs. Through counsel, Troy and defendant Sanele Faumuina ("Sanele") reached a settlement before trial. The trial as to defendant Pita Taliva`a ("Pita") took place on June 10 and 13, 1994.

## STATEMENT OF FACTS

The underlying incident in this action occurred at Nam's store in the Village of Leloaloa in American Samoa at about 10:00 p.m. on Saturday, September 7, 1991. Around 5:00 p.m., Troy and three friends had purchased two cases of large-bottled beer and began consuming them in their Village of Auto, which is east of Leloaloa. Later that evening, Troy drove his friends in the pickup to the vicinity of the American Samoa Government's port facilities in the Village of Fagatogo, which is located west of Leloaloa, where they consumed more beer. On the return to their village they stopped at Nam's store to buy something to eat. Troy purchased a package of frozen mussels from the sales clerk and Sitoa Masoe ("Sitoa"), one of Troy's companions, took the mussels across the road to defrost them in Pago Pago Bay. Shortly thereafter, Troy decided to eat the mussels and found that they tasted and smelled bad.

Troy returned to Nam's store to exchange the package of mussels for a new one, but encountered resistance from the sales clerk. Nam Jun Gul, the store's owner, heard the dispute and came down from the second floor to the store below. Nam was reluctant to exchange the mussels because he had just procured the mussels the day before and Troy had already opened the package, but after further discussion, Nam detected a kerosene-

37

like smell to the mussels and agreed to the exchange.

While agreement on the exchange was being reached, Sitoa entered the store and in a loud voice called Nam a crook, cursed him, and demanded a case of beer. Troy sought to control Sitoa and ushered him outside. Nam immediately closed the store and boarded the front windows. His regular closing time was at hand, as the 10:00 p.m. village curfew hour began.

Some members of the village *aumaga*, or young men's organization, began assembling to patrol the village and enforce the 10:00 p.m. curfew when their attention focused on the commotion at Nam's store.

Meanwhile, someone had telephoned Faumuina Ione ("Faumuina"), the sa`o, or senior chief, of the Faumuina family who owns the land on which Nam's store is located. Ione also owns the store building and lives in the house immediately next to the store. At the time, Faumuina was in the Village of Aua, a short distance to the east, with his son, Sanele, and his son-in-law, Pita.

Sanele and Pita persuaded Faumuina to let them return to Nam's store and investigate the reported disturbance. When they arrived the aumaga were gathering near the front of Nam's store. Troy decided to leave when one aumaga member that he knew told him about the curfew, but as he attempted to drive away with his companions, Sanele parked his Ford sedan in a manner that temporarily blocked Troy from driving onto the main road. Sanele and Pita got out of the sedan and Sanele reached inside Troy's pickup, turned off the ignition, and removed the key.

The immediate instigator of the melee that next took place is disputed. Troy testified that Sanele ignored his inquiries about the taking the key and walked towards the rear of the pickup. At the same time Pita allegedly hit Sitoa, who was seated in the pickup bed, on the back of his head with a bottle. Next, as Sanele appeared to be approaching Sitoa, Troy threw a bottle at Sanele. The aumaga members then began the ensuing rock and bottle throwing contest between Troy's group and the aumaga, Sanele and Pita.

Pita denied striking Sitoa with or without any object. He claimed that Sitoa was standing in the pickup bed and that the melee began because Troy threw a bottle at Sanele. In another version, Filipo Tualo, a member of the aumaga present, testified that the onslaught commenced when Sitoa threw a bottle moments before Sanele and Pita arrived.

38

We are persuaded that the following most likely occurred. First of all, the aumaga interpreted the situation as an intrusion to the sanctuary of their village and armed themselves with rocks in anticipation of possible open warfare. Further, as essentially simultaneous events, without one being the immediate cause of the other, Pita struck Sitoa with an object while he was in the back of the truck, and Troy threw a bottle at Sanele. Next, the aumaga jumped in, almost instantaneously, and escalated the physical hostilities between the two groups.

We cannot conclude from the evidence who threw what particular object and with what result, but certain events of some significance are evident. Pita removed the sedan to relative safety near Faumuina's house and went to the side of Nam's store where a principal source of the thrown rocks was located. Troy struck Sanele on the shoulder with a bottle as he was walking to Faumuina's house. A short time later Sanele was seen with a gun. Direct testimony was offered that, at a minimum Sanele fired the gun into the air, ostensibly to bring matters under control. Vastly outnumbered and fearing for their safety, Troy and his group retreated to a passing aiga bus to return to Aua. Later, Troy returned to the site of the incident and found his truck severely damaged.

Certainly, intoxication played a major part in the events at Nam's store. Of particular significance, Sitoa had consumed a substantial quantity of beer and reached the point of manifest inebriation when the episode at Nam's store began. His intoxicated behavior was a significant contributing factor to the confrontation that followed. Troy, a commissioned harbor patrol officer, testified to only drinking one to two beers. It is evident that he did not drink as much as Sitoa, but it appears that he consumed more beer than he admitted.

According to the evidence, Troy's other two companions also consumed their share of beer, but their precise role in the situation was not directly demonstrated by evidence. No one was permanently injured during the object-throwing fray, but Troy's pickup did not fare so well. Although it had already suffered minor damage before Troy and his companions retreated, by the time the aumaga was finished, the truck was destroyed. The front grille was removed; the windshield and rear window of the cab were smashed; the headlights and at least one taillight were broken; the body was dented and scratched in numerous locations; and many bullets were shot into the rear of the cab.

The pickup would have ended up in Pago Pago Bay had not Sala Uti, Leloaloa's pulenu`u, or mayor, intervened. He stopped the aumaga as

they attempted to navigate the pickup over a dirt embankment into the water and forced them to leave. Sanele and Pita were present when the pulenu`u arrived. Even though they assisted, the evidence of their role as leaders during the devastation of the pickup was not convincing.

## DISCUSSION

*I. Joint and Several Liability*

The primary issue is whether Pita is at fault, and if so should he be liable for all of Troy's damages. In other words, even though Pita is not the lone tortfeasor, is he joint and severally liable for the harm caused to Troy?

■ The general rule covering joint and several liability is that when two or more persons legally cause harm to another, each is liable for the entire harm. *Gorelick v. Dept. of State Highways*, 339 N.W.2d 635, 643 (Mich. Ct. App. 1983); RESTATEMENT (SECOND) OF TORTS, § 433A (1965). If the tortious acts concurrently[1] cause a single indivisible injury, then those who committed the acts are liable as joint tortfeasors, *Margain v. Maize and Blue Properties, Inc.*, 753 F.2d 47, 49 (6th Cir. 1985), and as joint tortfeasors, they are jointly and severally liable for compensatory damages. *Clark v. Bunker*, 453 F.2d 1006, 1011 (9th Cir. 1972).

■ The principle behind concert of action is that the participants are not acting independently, but are jointly engaged in a common tortious endeavor that is the proximate cause of the plaintiff's injury. *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004, 1015 (D.S.C. 1981). A participant in a tortious act is jointly and severally liable for harm resulting to a third person if the tortious act is done in concert with another, or if the participant knows that another's conduct constitutes a breach of duty and gives substantial assistance or encouragement, whether or not the participant's own conduct, separately considered, constitutes a breach of

---

[1] Concurrent causation is where the acts of two defendants occur at about the same time and together produce harm, whereas, in successive causation, the acts of two defendants occur at distinct different times and together produce harm. In concurrent injury cases those who caused the harm should be joint and severally liable for the entire harm, whereas, in successive injury cases the damages should be apportioned between the defendants, if they are reasonably apportionable. *McLeod v. American Motors Corp.*, 723 F.2d 830, 834 (11th Cir. 1984).

duty to the third person. RESTATMENT (SECOND) OF TORTS, § 876 (1979).

Concert of action has been found in group assault and battery, conversion, and trespass. *Ryan*, 514 F. Supp. at 1015. Pita, Sanele and the aumaga, acted in concert in damaging Troy's truck. They blocked the travel of Troy's truck and withheld the keys so he could not leave. Next, they jointly damaged the vehicle by striking it with stones, removing parts, and shooting at it a number of times with a gun. Pita substantially assisted and encouraged the group throughout these events. These actions resulted in an intentional tort that was the proximate cause of plaintiff's injury. But for the actions of Pita, Sanele and the aumaga, Troy would not have sustained any harm. Since they acted in concert to cause these damages, Pita is jointly and severally liable for Troy's compensatory damages.

Many courts now apportion damages among joint tortfeasors instead of applying joint and several liability, but only when it is feasible. Apportionment is feasible when the plaintiff has suffered factually separable or divisible harm that can be allocated among tortfeasors with reasonable certainty. *Margain v. Maize and Blue Properties, Inc.*, 753 F.2d 47, 49 (6th Cir. 1985). If apportionment is reasonable, then each tortfeasor is subject to liability only for the portion of the total harm that each has personally caused. *U.S. v. Monsanto*, 858 F.2d 160, 171 (4th Cir. 1988); *Rauscher v. Halsted*, 557 P.2d 1324, 1326 (Wash. Ct. App. 1976) (apportioned damages was feasible among tortfeasors who trespassed on plaintiff's land and cut down trees, because defendant only cut two of 32 trees and is ascertainably liable for one-sixteenth of the total damages).

In this case, the damages cannot be apportioned with reasonable certainty. It cannot be known who threw how many rocks or shot how many bullets at plaintiff's truck; only that defendant intentionally participated in the destruction of the vehicle. This was a single incident and due to the number participants that acted together and the surrounding events, the harm cannot be divided in a reasonable manner. Therefore, apportionment of damages is not feasible.[2]

Moreover, even if apportionment could be reasonably applied, joint and several liability remains the rule for intentional torts. *Haynes v.*

---

[2] The holding to not apportion damages is limited to the specific facts and unique situation of this matter. This court has previously apportioned damages, such as in products liability actions, and may do so in the future depending on a case by case review.

*Manning*, 717 F. Supp. 730, 737 (D. Kan. 1989); *Lynn v. Taylor*, 642 P.2d 131, 135 (Kan. Ct. App. 1982) (no authority for including an intentional tort within the realm of comparative fault principles). We do not see any principle or other valid reason warranting any modification of the joint and several liability rule in this intentional tort situation.

## II. Intentional Infliction of Emotional Distress

■ Troy claims that Pita's actions placed him in great fear for his life and prays this court for $10,000 in damages resulting from intentional infliction of emotional distress. Damages for intentional infliction of emotional distress are usually only awarded for mental suffering so extraordinary, vindictive, extreme, or outrageous as to give rise to a cause of action for intentional infliction of emotional distress. *Kajtazi v. Kajtazi*, 488 F. Supp. 15, 20 (D.N.Y. 1978).

The conduct of Pita and the others was not beyond all bounds usually tolerated by decent society, or of a nature which causes mental distress of a very serious kind. RESTATEMENT (SECOND) OF TORTS, § 46, cmt. g (1948). The aumaga was defending their village, and Troy and his companions participated in the escalation of the incident. We do not believe from the evidence that Pita or anyone else, intentionally inflicted emotional distress on Troy, or for that matter, that Troy actually suffered emotional distress from the event that would be recoverable by law.

## III. Punitive Damages

■ Troy also requests $10,000 in punitive damages. Punitive damages may be recovered whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy in order to punish the defendant and deter others from the commission of similar wrongs. *Lynn v. Taylor*, 642 P.2d at 136. Although this court wishes to deter intentional torts, it would be too extreme to hold Pita liable for punitive damages.

## IV. Attorney's Fees and Costs

■ Troy seeks attorney's fees and costs. Attorney's fees are not ordinarily recoverable by the prevailing party, but courts do have the power to award attorney's fees when an opposing party has acted in bad faith, wantonly, oppressively or when a statute dictates. *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 129 (1973). We find no valid reason to award attorney's fees in this case. Troy is, of course, entitled to costs of suit in addition to his compensatory damages. T.C.R.C.P.

54(d).

## V. Compensatory Damages

 Troy has proven $7,774.65 in actual damages, $7,114.65 for the cost of repairing his truck and $600 for alternative transportation. Since Pita is joint and severally liable for these compensatory damages, we must now take into consideration Troy's settlement with Sanele, the absent joint tortfeasor, before trial. A primary purpose behind tort law is to compensate the injured party. If only one of several tortfeasors is a party to the litigation, then the court must assure that the plaintiff is compensated even if a single defendant must pay all of the damages. The single defendant has a right of contribution against any absent tortfeasor. Shifting the burden of recovery to the tortfeasors assures that the injured party is compensated. *Hammond v. Kansas, O & G Ry. Co.*, 234 P. 731, 732 (1925).

When determining the amount of compensation to which a plaintiff is entitled to actually receive, the court is duty-bound to consider settlement payments previously received by the plaintiff. *In re Jones*, 804 F.2d 1133, 1143 (10th Cir. 1986) (amount of settlements received by plaintiff from two absent tortfeasors before trial was deducted from the final judgment awarded to plaintiff from remaining defendant).

T.C.R.Ev. § 408 states in part: "Evidence of . . . accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. . . ." This rule of evidence does not bar this court from reducing Troy's recovery from Pita by the amount Troy has already recovered in a good faith settlement with Sanele. In fact, if a civil jury trial was involved, our function would be to reduce the verdict by the amount received by the plaintiff from absent tortfeasors because of settlements. *Cleere v. United Parcel Service, Inc.*, 669 P.2d 785, 789, 791 (Okla. Ct. App. 1983).

 The amount of recovery should be diminished by the amount of settlement with the absent tortfeasor and not by percentage of fault. This is consistent with the tort policies of 1) encouraging settlements and 2) assuring that a plaintiff is fully compensated for injuries sustained. *Mayhew v. Berriren County Road Com'n.*, 326 N.W.2d 366, 371 (Mich. 1982). Troy has already been fully compensated for actual damages through the settlement with Sanele and would be unjustly enriched if we

ordered Pita to in fact pay damages.

Accordingly, although we award judgment for Troy and against Pita in the amount of $7,774.65, we must reduce the amount payable by Pita to Troy by the $9,000 received in the settlement with Sanele. Troy is not entitled to receive any amount from Pita.

It is so ordered.